# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No. 14-1246
)
7218 Large Street )
Philadelphia, PA 19149 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*: The premises known as 7218 Large Street, Philadelphia, PA 19149, a two story row house, as more fully described in Attachment A,

Located in the ___Eastern___ District of, ___Pennsylvania___ there is now concealed *(identify the person or describe the property to be seized)*: See Attachment B, attached and incorporated herein for list of items to be seized

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

Code Section: 21 U.S.C. §§ 846, 841(a)(1)    Offense Description: conspiracy to distribute heroin

The application is based on these facts: See Affidavit attached and incorporated herein.

☐ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days:) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

William Capra, S/A, Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/3/14

as authorized by Honorable Linda K. Caracappa U.S.M.J.
*Judge's signature*

City and state: Philadelphia, PA

Honorable Linda K. Caracappa
12/4/2014 *Printed name and title*
L. K. Caracappa, USMJ

## **Attachment A**

1. The Subject Premises is located at 7218 Large Street, Philadelphia, PA 19149, more fully described as two story brick row home outfitted with security cameras overlooking the front entry door and the rear entry door. The Subject Premises is the only residence on the 7200 block of Large Street with easily visible security cameras. The rear entry of the Subject Premises leads to a private driveway that is connected to an alleyway. The front door of the Subject Premises has a heavy duty screen door with reinforcement around the door knob and lock area.

## Attachment B- Items to be Seized

a) United States currency.

b) Books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances

c) Contraband, including controlled substances.

d) Paraphernalia for the storing, weighing, distributing of controlled substances, including paraphernalia such as, but not limited to, scales, distribution bags, cutting materials, and stamp and mark products.

e) Financial instruments, records of financial transactions, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate, transactions, records of automobile purchase, lease and maintenance transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers.

f) Indicia of ownership or control of the Subject Premises.

g) Address books, telephone books or papers; cellular and mobile telephones.

h) Photographs and videos of associates of the DTO.

i) Firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons, together with ammunition and other firearms paraphernalia, such as holsters, the boxes in which firearms are purchased, receipts for firearms, and protective equipment, such as ballistic vests. These firearms and firearm paraphernalia are used to protect and secure

a drug trafficker's property.

j) Computers, "smart phones," facsimile machines, currency counting machines, including, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives and other computer-related electronic devices which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data.

k) Travel documents and passports.

14-1246

## AFFIDAVIT FOR SEARCH WARRANT

I, William Capra, being duly sworn, depose and state the following:

1. I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered to conduct investigations of, and to make arrests for, the offenses enumerated in Titles 8, 18, 19, 21, and 31 of the United States Code and other related offenses.

2. I have been employed as a Special Agent by Homeland Security Investigations (HSI), since November 2006. Prior to my employment as a Special Agent, I was an Officer with Customs and Border Protection (CBP), from October 2004 through November 2006 at the Newark Liberty International Airport. I have been employed as a federal law enforcement officer for more than ten years. Since becoming a Special Agent, I have participated in numerous investigations into suspected international narcotics trafficking and money laundering. I am currently assigned to the Philadelphia HSI, Airport Investigations Group. Prior to my current duty location, I was assigned to the Pittsburgh Assistant Special Agent in Charge (ASAC) HSI Office, Contraband Smuggling Group.

3. I am responsible for investigations focusing on the importation and distribution of narcotics by international organizations operating in foreign countries and the United States. I am cross-designated and have the authority to conduct Title 21 investigations and enforcement activities. I have been involved with investigations for Title 21 offenses and am familiar with the Interagency Cooperation Agreement between the U.S. Drug Enforcement Administration (DEA) and ICE. As a law enforcement officer, I am have

participated in numerous searches and arrests, debriefing of criminal defendants and confidential sources, initiation and monitoring of pen registers and trap and trace devices, and monitoring of authorized wire communication intercepts. As such, I am familiar with the operation of illegal drug trafficking organizations, and the methods used to import and distribute narcotics and launder the proceeds.

4. In addition to my investigative experience, I have successfully completed the following trainings: Customs and Border Protection Integrated Basic Academy, Criminal Investigator Training Program, ICE Special Agent Training, Conducting Title III Intercepts, Asset Identification and Removal Group/Financial Investigations training, and Designated Technical Agent training. I have also earned a Bachelor's degree in Law Justice Studies, with a minor in Business Administration, from Rowan University in Glassboro, New Jersey in December 2001.

5. I make this affidavit in support of an application by the United States of America for the issuance of a warrant to search for and seize evidence, fruits, or instrumentalities of the importation of controlled substances in violation of Title 21, United States Code, § 952(a) and conspiracy to distribute controlled substances, in violation of Title 21, United States Code, § 846.

6. The property to be searched is 7218 Large Street, Philadelphia, PA 19149, Philadelphia, PA 19140 (the Subject Premises); it is controlled by an unknown Hispanic male, who is a suspected member of a Mexican and Dominican Drug Trafficking Organization (DTO). The property is more thoroughly described in Attachment A.

7. The items to be searched for and seized relate to the importation of and conspiracy to distribute controlled substances and are more thoroughly described in Attachment B.

8. The information set forth below is derived from information known personally to me, on information received from other law enforcement agents and officers, an on information obtained through various investigative means, such as:

   a. Physical and electronic surveillance conducted by law enforcement officers involved in this investigation.

   b. Observations made and information gathered through arrests made during previous investigations conducted by Philadelphia HSI and/or the Drug Enforcement Agency (DEA).

   c. Records and documents of federal and state government agencies, including records, and documents maintained in the normal course of business by private concerns.

   d. Evidence suspected to generated from inside the Subject Premises.

9. The purpose of this affidavit is limited, in that its sole purpose is to establish probable cause that certain crimes have been committed and that there is probable cause to believe that evidence, fruits or instrumentalities of those crimes are located in the location to be searched. Therefore, this affidavit does not contain every material fact that I have learned during the course of this investigation. However, no information known to me that would tend to negate probable cause has been withheld from this affidavit.

## Background on the Investigation and Facts Establishing Probable Cause

10. Since August of 2014, Philadelphia HSI and DEA have been conducting a joint investigation into a large scale Mexican and Dominican heroin smuggling organization, operating between the Dominican Republic, Mexico and the Philadelphia region. The investigation was predicated based upon intelligence received from several sources of information that report to Philadelphia HSI and/or the DEA.

11. On August 29, 2014, HSI special agents conducted physical surveillance of the Subject Premises and observed that it had been outfitted with security cameras overlooking the front entry door and the rear entry door. The rear entry of the Subject Premises leads to a private driveway that is connected to an alleyway. Agents also observed that the front door of the Subject Premises had a heavy duty screen door with reinforcement around the door knob and lock area. Agents noted that the other row homes on the 7200 block of Large Street did not have similar security precautions as the Subject Premises.

12. On September 15, 2014, HSI Special Agent (SA) Gregory Milligan observed a black Honda bearing Pennsylvania registration JPF-6356 parked in the rear driveway of the Subject Premises. The aforementioned vehicle is registered to Rey CASTILLO at 155 Godfrey Street, Philadelphia, Pennsylvania 19120. The black Honda detailed above has been observed at the Subject Premises throughout the course of this investigation and it is suspected that its operator resides at the Subject Premises.

13. On September 16, 2014, HSI SA Gregory Milligan and I met with a source of information and he/she identified Rey CASTILLO as a person "who has customers with bundles (heroin)." Your affiant is aware based on a review of prior law enforcement

reports of HSI agents that Rey CASTILLO was observed at a known heroin mill, or location for processing bulk heroin into bundles for street distribution and sale, in northeast Philadelphia, not far from the subject premises in December 2013. Previously it was believed by your affiant and other federal agents engaged in this heroin trafficking investigation that Rey CASTILLO was a worker in Philadelphia area heroin mills; however, further investigation has led agents to conclude that CASTILLO has a higher ranking role as a manager or organizer of heroin mills in Philadelphia, based on analysis of PENNDOT records which show that CASTILLO is the registered owner of multiple (more than ten) motor vehicles, several of which have been linked to and regularly parked near multiple Philadelphia heroin mills, including the one believed to be located at the subject premises, 7218 Large Street, Philadelphia, PA. I have reviewed CASTILLO's criminal arrest record which discloses that Castillo has had seven arrests for narcotics and firearms violations in both Delaware and Pennsylvania since 2007; the charges include multiple arrests for narcotics violations, one arrest for a firearms offense and a charge of aggravated assault. I have further reviewed CASTILLO's U.S. passport application, which states that CASTILLO was unemployed as of June 20, 2013, the date of the application. However, notwithstanding Rey CASTILLO's apparent lack of employment, CASTILLO is known to reside at an upscale four-unit condominium with a value of at least $250,000, in the area of Northern Liberties in Philadelphia.

14. On October 16, 2014, at approximately 5:05 PM, I conducted physical surveillance of the front of the Subject Premises and I observed and photographed an unknown Hispanic male with dark short hair and beard, dressed in a grey and purple hooded sweatshirt and blue jeans exit a dark colored Honda sedan bearing Pennsylvania

registration JNJ-5623. The aforementioned vehicle is registered to Rey CASTILLO at 3348 Jasper Street, Philadelphia, Pennsylvania 19134. The unknown Hispanic then walked away from the vehicle and entered the Subject Premises. I have compared a photograph of the unknown Hispanic male and Rey CASTILLO'S Pennsylvania driver's license and believe that they are not the same person.

15. On October 17, 2014, DEA Special SA Patrick Moynihan and I interviewed a source of information about several investigations. The source of information was provided a photograph of the above Hispanic male and no other information relevant to surveillance at the Subject Premises. The source of information positively identified the unknown Hispanic male as a person that he/she attended high school with and who is currently a distributor of "bundles" (heroin).

16. On October 21, 2014, at approximately 3:45 AM, DEA SA Moynihan and I removed three trash bags from the rear of the Subject Premises. The three trash bags were seized by agents prior to removal by City of Philadelphia Public Works personnel that were scheduled to remove the trash on the same day. An examination of the trash bags revealed a food saver heat sealed wrapper torn in two pieces with residue that field tested positive for the presence of heroin, two inch by one inch Ziploc bags with residue, a small Ziploc bag with residue, one blue glassine envelope with a red Nike stamp with residue that field tested positive for the presence of heroin, and a small, amber pill bottle with no label, marked "Animal", scratched into bottle and a pair of used rubber gloves containing residue. Additionally, agents seized a piece of mail addressed to Rey F. Castillo Jr, 7218 Large Street, Philadelphia, PA 19149.

17. On November 1, 2014, at approximately 12:55, DEA SA Moynihan observed an unknown dark skinned male subject with a black Nike shirt exit the rear of the Subject Premises and entered a green Honda parked in the rear driveway. The unknown dark skinned male obtained a small item near the gas tank of the vehicle and reentered the rear of the Subject Premises. Later the same day, the unknown dark skinned male exited the rear of the Subject Premises with a grey duffel bag and entered the green Honda. He then departed the location in the same vehicle.

18. On November 18, 2014, at approximately 10:30 AM, DEA SA Moynihan and DEA Taskforce Officer Kyle Boyd removed two white plastic trash bags from the rear of the Subject Premises. The two white plastic trash bags were seized by agents prior to their removal by City of Philadelphia Public Works personnel that were scheduled to remove the trash on the same date. An examination of the trash bags revealed three blue glassine envelopes, with an off white powder residue that field tested positive for heroin, as various packaging material with residue, and one pair of clear latex gloves, with a brown residue. It should be noted that DEA SA Moynihan observed an unknown Hispanic male carrying the trash out of the Subject Premises approximately one hour before the "trash pull." Both DEA SA Moynihan and I believe that this could have been a tactical decision by the DTO to minimize the amount of time that the evidence was unsecured and exposed to law enforcement seizure.

19. On December 2, 2014, at approximately 9:20 AM, DEA SA Moynihan removed three white plastic trash bags from the rear of the Subject Premises. The three white plastic trash bags were seized by DEA SA Moynihan prior to their removal by City of Philadelphia Public Works personnel that were scheduled to remove the trash on the

same day. An examination of the trash bags revealed four large foil wrappers (kilo quantity), with an off white powder residue that field tested positive for heroin. One wrapper contained the name "RAY" written on it with a black marker. There were also two pint sized Ziploc bags with a stripe through them containing an off white powder residue, three shopping bags and eight dryer sheets in the trash. I know based upon my training and experience, that drug smugglers wrap narcotics in dryer sheets during its importation and distribution in the United States because they believe the dryer sheets hide the scent of narcotics from police K-9s.

20. I believe based on my experience in this investigation that the Subject Premises is being used to facilitate the importation and distribution of controlled substances, namely heroin, based upon several sources of information, physical and electronic surveillance and the evidence seized during three separate trash pulls. I further believe that the DTO feels that the location is a safe and secure "stash house" for heroin because it has been operational in that capacity since at least August 2014.

### Entry after 10:00 pm. with no knock, upon viewing suspicious activity outside of the Subject Premises

21. During this investigation, agents have viewed and retained electronic surveillance that indicates that the Subject Premises has a significant amount of activity at the rear entry of the Subject Premises. Agents have frequently observed individuals coming and going into the Subject Premises through the rear entry in the early morning hours. Additionally, for the safety of law enforcement officers, and to avoid giving the organization the opportunity to destroy evidence, surprise is a key element. Therefore, we request authority to enter the Subject Premises once agents observe a significant

amount of activity at the Subject Premises, without announcing our presence, in order to avoid the risk of members of the DTO destroying evidence, fleeing, or seeking to defend the stash house or retaliate with firearms.

### Information Regarding Drugs, Drug Records and other Related Documents

22. Based on my training, experience, and participation in other drug investigations involving controlled substances, and upon the information and experience of other HSI and DEA special agents I have spoken with, I know:

   a. That drug smugglers must maintain on hand amounts of U.S. currency to pay their workers and pay other expenses of their ongoing narcotics business;

   b. That it is common for drug smugglers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. Further, these books records, receipts, notes, ledgers, etc. are maintained where the smugglers have ready access to them; for example, in their residences.

   c. That it is common for narcotics smugglers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences and/or locations which they maintain dominion and control over, for ready access to conceal these from law enforcement authorities.

   d. That is common for drug smugglers to maintain paraphernalia for

the storing, weighing and distributing of controlled substances, including paraphernalia such as, but not limited to, scales, distribution bags, cutting materials, and stamps to mark product.

e. That it is common for drug smugglers to maintain the items and records described in paragraphs above for long period of time regardless of whether their value to the drug dealer has diminished. This type of evidence is often generated, maintained, and then forgotten about. Thus, documents that one would think a prudent person would destroy because of their incriminating nature are possessed months or even years after the documents came into the possession of the drug traffickers. Oftentimes these individuals do not even realize the incriminating nature of the documents they keep. I am aware of the execution of search warrants where documentary drug trafficking and smuggling evidence dating back many months and even years has been found.

f. That drug smugglers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or businesses entities to avoid detection of these assets by Government agencies.

g. That even though these assets are in other peoples' names, the drug traffickers actually own and continue to use these assets, and exercise dominion and control over them.

h. That it is common for drug traffickers to maintain evidence pertaining to their obtaining, securing, transfer, concealment, and/or expenditure of drug proceeds, such as: currency, financial instruments,

records of financial transactions, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, records of automobile purchase, lease and maintenance transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by drug traffickers within their residences and businesses. Such evidence identifies and documents assets and income attributable to drug trafficking;

i. That drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization, and that these traffickers also store such telephone numbers in the memories of cellular and mobile telephones. Such records document the relationships of co-conspirators.

j. That drug traffickers take or cause to be taken photographs and videos of themselves, their associates, their property, and their product. These traffickers usually maintain these photographs in their possession at their residences. Such records document the relationships of co-conspirators.

k. That drug traffickers commonly have in their possession i.e., on their person and/or at their residences, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons, together with ammunition and other firearms paraphernalia, such

as holsters, the boxes in which firearms are purchased, receipts for firearms, and protective equipment, such as ballistic vests. These firearms and firearm paraphernalia are used to protect and secure a drug trafficker's property.

l.  That narcotics traffickers often utilize electronic equipment such as computers, "smart phones," facsimile machines, currency counting machines, and other electronics to generate, transfer count, record and/or store the information described in paragraphs (b), (c), (f), (g), (h) and (i) above. This equipment includes computer components, computer peripherals, word processing equipment modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives and other computer-related electronic devices which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data. This equipment can use programs stored in the form of electronic or magnetic media which are capable of being interpreted by a computer or related components, including operating systems, application software, utility programs, compilers, interpreters, and other programs or software suited to communicate with computer or hardware or peripherals either directly or indirectly via telephone lines, radio or other means of transmission. Such items document assets, income, and the identities of and relationships between, co-conspirators.

23. Based upon the foregoing facts, my training and experience, and the investigation

conducted by myself and others, there is probable cause to believe that the Subject Premises will contain evidence, fruits, or instrumentalities of the importation of controlled substances, namely heroin, in violation of Title 21, United States Code, § 952(a) and conspiracy to distribute controlled substances, specifically, heroin, in violation of Title 21, United States Code, § 846.

24. For the reasons set for above, I respectfully request that a nighttime search warrant should be issued to search for all items listed in Attachment B as fruits instrumentalities and evidence of crimes described above.

William Capra, Jr.
Special Agent, Homeland Security Investigations

Sworn to and subscribed before me on this 3rd day of December, 2014. 5:40 p.m., by telephone as authorized by Hon. Linda K. Caracappa, U.S.M.J.

HONORABLE LINDA K. CARACAPPA
United States Magistrate Judge

12/4/2014 Confirmed
L. Caracappa, U.S.M.J.